Bailey and Others v. Wood and Others.

---

CASE 4.—ACTION BY T. G. BAILEY AND OTHERS AGAINST L. G. WOOD AND OTHERS, SETTLEMENT OF ACCOUNTS, &C.—OCT. 22.

# Bailey and Others v. Wood and Others.

APPEAL FROM LOGAN CIRCUIT COURT.

JUDGMENT FOR DEFENDANTS AND PLAINTIFFS APPEAL.    REVERSED.

SETTLEMENT OF ACCOUNTS—MISTAKE—EVIDENCE—INTEREST—BILLS OF EXCHANGE DISCOUNT—TOBACCO WAREHOUSEMEN— FEES— BOND —STATUTES.

Held:    1. Where one seeks to surcharge a settlement of account for mistake of facts not known to him when the settlement was made, it is incumbent on him to sustain the charge  clearly by a preponderance of evidence.

2. In an action to foreclose a mortgage, wherein defendant contended that the mortgage note was by mistake given for a greater sum than due, evidence considered, and HELD not to sustain such defense.

3. Defendant, in order to secure funds to purchase tobacco, was in the habit of drawing a draft on a factor, who paid the draft. Defendant then drew a bill of exchange with the factor as drawee and a certain national bank as payee. The factor then accepted and delivered the bill to the bank, which credited the factor with the net proceeds, deducting ten or eleven per cent. interest, the bill drawing six per cent, after maturity; and when due the factor paid it, charging the whole expense to defendant. HELD, that defendant drew as an accommodation indorser to the factor, and the latter was the principal, and hence interest paid to the bank by the factor was not chargeable to defendant, but he was liable for the legal interest on the original draft until he paid the debt.

4. Code Tenn., section 3381 (1880a) 2597, requires a tobacco warehouseman to give a bond to keep his warehouse in good condition. HELD, that when a warehouseman gives a bond, and then moves his business to another warehouse, it is not necessary for him to give a new bond.

5. Under Code Tenn., sections 3388, 3389, relative to inspectors of tobacco, and making warehousemen inspectors of tobacco, with authority to appoint deputies, it is not necessary that, the deputies should be warehousemen.

6. Several warehousemen have the right to appoint the same deputy.

7. Code Tenn.. section 3399 (1898a) 2615, provides the compensation of warehousekeepers for receiving, storing, inspecting, coopering, and selling tobacco shall be as follows, to-wit: To be paid by the seller, $2.50, and one per cent. commission on proceeds of sale; to be paid by buyer, $1.50, and for storage after sale, after the first thirty days, for each month or part thereof, twenty-five cents; and section 3400 (1899a) 2616 imposes a penalty for charging any more than is allowed in the preceding section. HELD, that the fees specified in section 3399 cover only the items enumerated, and on a resale of tobacco after a rejection of bids by the owner under authority of section 3400 the warehouseman on a resale may charge a fee of two dollars for his expenses for resampling and reselling, according to a custom prevailing for twenty years.

W. P. SANDIDGE, FOR APPELLANTS.

BROWDER & BROWDER, FOR APPELLEES.

(No briefs.)

OPINION OF THE COURT BY JUDGE O'REAR—REVERSING.

Appellees are tobacco warehousemen at Clarksville, Tenn. Appellant, T. G. Bailey, is a farmer, and was a buyer and shipper of leaf tobacco at the time of the transactions out of which this suit has grown. Prior to September 16, 1897, the dealings between the parties had been such that it was claimed by appellees, and then admitted by appellant, that he was indebted to them in a sum in excess of $4,329.04. On that date appellant executed to appellees a note for said sum, secured by mortgage on certain real estate in Logan county, this State. The parties continued to have, or to complete, after the date of the note, some transactions as to the sale of certain tobacco consigned to appellees. This suit was brought July, 1900, to enforce the mortgage lien in satisfaction of the note above mentioned. Defense was made. From the rather voluminous pleadings we gather that issue was tendered and joined as to the following matters, involving pleas of payment, usury, set-offs and counterclaims: (1) It was claimed that the indebtedness of appellant to appellees at the time the note was executed was not as much as the face of the note, the discrepancy occurring by reason of the fact that appellees had failed to account to appellant for all the tobacco shipped to and sold by them, and had failed to account for the true amount it sold for; that appellant, not knowing then the true state of accounts, but relying on appellees' representations concerning them, executed the note sued on for too great an amount, through mistake of fact and of law. (2) That the note embraced a large amount of usury charged appellant by appellees for the loan or forbearance of money furnished to him by them. (3) That appellees claimed to be and were operating a tobacco warehouse at Clarksville, Tenn.,

but had failed to comply with certain provisions of the
Code of Tennessee containing the statute law of that
State, and by reason of such failure had forfeited their
right, or rather had never legally acquired the right, to
charge for and receive the fees allowed by statute for
storing and selling tobacco; that these fees were collected
of appellant notwithstanding—at least are embraced in
the note sued on; that as to these also appellant was la-
boring under a mistake of law and fact when the note was
executed. (4) That by the statutes of Tennessee ware-
housemen are allowed $2.50 per hogshead and 1 per cent.
on the gross sales, to be charged to the shipper, as the
whole of their compensation for services rendered the
shipper in "receiving, storing, inspecting, coopering, and
selling" his tobacco; that appellees in many instances
(about 160) charged $2 additional to the fees enumerated;
that the Tennessee statutes provided a penalty of $10 for
each of said offenses, recoverable by action by the shipper.
Appellant claimed $1,600 on this score as a set-off to the
note. Other items of minor importance were presented
also. Whether allowed or disallowed, neither party to
this appeal seeks to disturb the chancellor's finding as to
them. Consequently they will not be noticed further.

The transactions between these parties began in 1894,
and continued until 1898. During this period the vol-
ume of these dealings was something over $43,000. When
the note sued on was executed, it was the evident purpose
of the parties to close their dealings by that transaction,
at least to the extent of the amount of the note, in the
nature of a settlement. The plea attacking the transac-
tion on the ground that appellant did not then owe appel-
lees that sum is in the nature of an attempt to surcharge
a settlement for mistake of fact, not known by the com-

Bailey and Others v. Wood and Others.

plainant when the settlement was made.   It is, of course, incumbent upon the party making the charge to sustain it, not merely by an appearance of probabilities, but clearly by the preponderance of the evidence.   Appellant shows himself, by his letters filed in the record, and by the manner of conducting his business, to be deficient in education, and rather loose in the matter of keeping his accounts.   This does not necessarily impeach his general intelligence, but the fact will serve to explain, we think, wherein he might easily have been deceived either by appellees, if they had undertaken it, or by his own lack of accurate information as to his own affairs.   In his showing in the evidence under this first head he testifies merely that he shipped in the aggregate 384 hogsheads of tobacco to appellees, which they sold on his account.   The dates of sales, the weights (in most instances), the prices and the amount of net proceeds he says nothing about.   He relies entirely upon appellees' showing to supply the needed evidence on this point.   This showing is made—it may be said, exclusively—in the testimony of the witness Ely, appellees' bookkeeper, introduced by them.   The manner of producing this evidence for appellant must be noticed. Appellees had filed with an amended pleading a "statement," in which they purported to give the exact state of the account between these parties.    This statement credited, by date, etc., the net proceeds of the sale of each hogsheads of tobacco.   During the examination of the witness Ely by appellees' attorney, he testified that this statement had just been compared with the firm's books (then present, it seems), and was correct in every item, save he had not verified the extensions of interest, and there was an error of $1.06 in the footings against appellant.   The statement and books of appellee were then present where

Bailey and Others v. Wood and Others.

the depositions were being taken, it appears. On cross-examination this witness was asked to file, and in compliance did file, a statement from the books showing original (or private) numbers of appellant's tobacco, the dates sold, price per 100 pounds at which it was sold, and the weights. No further question along these lines was asked of this witness or any witness. From the original "statement" first adverted to the claim and theory of appellees as to the state of this account is sustained. But by a comparison between that first statement and the one elicited from the witness Ely by the question mentioned it is shown that in nearly every instance (there were but few, if any, exceptions) the sum by which appellant was credited on the first "statement" as the proceeds of the sale of his tobacco was less, and sometimes much less, than the last statement showed that the same tobacco brought, by multiplying the net weight by the price per 100 pounds. This makes a considerable difference, apparently in appellant's favor; and upon this state of facts is built an ingenious argument, maintained with the rare ability displayed by able counsel throughout the case, that appellees had failed to account to appellant for the true amount or the whole of the money for which his tobacco sold. It must be remembered that the first statement professed to give the net proceeds only of sales. The result of the last statement was necessarily to learn only the gross proceeds of the sales. Between these two results was a difference as obvious in reason as in fact. That the warehousemen charged for and deducted their statutory commissions for making the sales, and in many instances the $2 fee for reselling, hereinafter more fully discussed, is admitted. That they also paid the freights and drayage is also clearly shown, and is not disputed. What these

freight and drayage charges amounted to the record does
not show. No witness was asked concerning them. But,
after deducting the charges for fees alluded to, there re-
mained generally, and indeed, in about every instance, a
sum that would not be presumably disproportionate to
what must have been the freight and drayage charges
paid by appellees for appellant on each package or group
reported sold. Another item—insurance—was admitted-
ly paid by appellees. That amount was not shown, nor
was it attempted to be. Appellees' books, as has been
stated, were present. The course of the examination of
the witness showed that they were before counsel, and
were submitted to his inspection. Whether they showed
or failed to show the items just referred to, the record is
silent. But the discrepancy between the statements,
made up from the same books and entries, one showing
net and the other gross proceeds of sales, indicates pretty
conclusively that these books will show something as
charges which reduced the gross sales by the amount of
this difference. It was, then, for appellant to show either
that these discrepancies were not so accounted for, or
that they were not properly accounted for. The volume
of these transactions, their nature and the period of time
over which they extended, were such that it would have
been impracticable, if not well-nigh impossible, at this
late date to have shown them otherwise than by the origin-
al entries made concurrently with the transactions. That
the usual statements of each sale, showing itemized bills,
were furnished appellant, is shown. The failure to ob-
ject to them then, or in a reasonable time, coupled with
the entries of the charges just referred to, and especially
with the partial settlement made when the note was exe-

cuted, made out for appellees a *prima facie* case that such charges and sales had occurred as therein stated, and thereafter the burden was upon appellant to invalidate them. In this he failed. The circuit court so ruled.

2. It is claimed by appellant that appellees agreed, as an inducement to him to bring his business to their warehouse, that they would furnish him what money he needed to enable him to make his purchases in the country, provided he would ship the tobacco to them. They looked to their factor's lien to reimburse them the money thus advanced. As to what was actually agreed on this score is not made as clear as could be desired. But from all the evidence, from the character of the dealings between the parties, and from what appellees actually did, we conclude that appellant is sustained in this contention. Appellees say that they did not have extensive capital, but did have a large credit with the banks of their town. The bank with which they are shown to have transacted the business so far as this venture is concerned, was the First National Bank of Clarksville, Tenn. This bank had a capital of $100,000. Appellees had already borrowed from it for use otherwise in their business $10,000, or 10 per cent. of its capital, the maximum sum which it could loan to one person or firm under the national banking act. Appellant does not appear to have been known to this bank, nor to have had any credit there. So, when appellant needed money in making his purchases in the country, he would draw a sight draft on appellees for the sum required. This draft he generally procured his own banker at Adairville, Ky., to cash for him. The Adairville bank would forward the draft, through regular channels, to Clarksville, where is would be paid by appellees. Thereupon appellees would draw up a four-months bill of ex-

Bailey and Others v. Wood and Others.

change for the sum just paid, plus the bank rate of discount, or interest for that time at 10 per cent., or 11 per cent. per annum, and send to appellant to be signed and returned to them. In this bill appellant appeared as drawer, appellees as drawee, and the First National Bank of Clarksville as payee. When so signed and returned to them, appellees would accept the bill by their written indorsement across its face, and deliver it to the First National Bank of Clarksville, who would thereupon credit to appellees the net proceeds—that is, the original sum for which appellant had drawn—the bank reserving to itself the interest or discount referred to. When this bill became due, appellees paid it, and charged its gross sum as of that date to appellant. In this way appellant was made to pay the interest, whether at 10 per cent. or 11 per cent., for the use of this money from the date he received the money till the bill became due, and 6 per cent. per annum thereafter on this sum until he repaid it to appellees. There were a great number of these transactions. Appellant seeks a credit for the whole of the interest thus paid by appellees, or at least for the excess of interest paid over the legal rate (it being admitted that 6 per cent. per annum was the legal rate of interest in Tennessee at that time). Appellant stakes his claim to this relief on two grounds:   (a) That the real transaction was between appellees and appellant; that it was appellees who procured the money, and furnished it to appellant, and whether they kept the interest charged or gave it to the bank for supplying them with the money is immaterial as affecting the character of the transaction between these litigants.   And (b) although the transaction may be that appellant borrowed the money from the bank—that is, discounted the paper to the bank—appellees were thereon merely his accommodation

indorsers, and therefore his sureties; and the taking of a discount at a higher rate than 6 per cent. per annum was usury, and under Revised Statutes U. S., sections 5197, 5198, forfeited all the interest in that bill, and that thereafter no party to the paper was obligated in law to pay any part of the interest; and therefore, when appellees, as such indorsers (or accommodation acceptors), did pay it, it was a voluntary act, and imposed on him no legal liability to repay them the interest so paid. The last of these propositions only—being the most favorable—is argued by counsel for appellant in his brief. The first is gathered from the pleadings. We find ourselves unable to agree with the last proposition. The error of its conclusion rests upon what we believe is a misconception of the relation of these parties. It is assumed in the argument that the acceptor of a bill of exchange is the surety of the drawer to the payee. Just the converse of this is true. "The effect of the acceptance of a bill is to constitute the acceptor the principal debtor. The bill becomes, by the acceptance, very similar to a promissory note; the acceptor being the promisor, and the drawer standing in the relation of the endorser." Daniel, Neg. Inst., section 532, and cases cited. The same author (section 1303), treating of who are principals and who sureties, and general principles of sureties' liabilities, says: "In the first place, as to who are to be regarded as principals and who as sureties: The acceptor of a bill and the maker of a note, when the acceptance is made or note executed upon a valuable consideration, are undoubtedly principals as to all the parties thereto." The same author recognizes what must be the law in this respect, and that is that, as between drawer and acceptor, their obligations and rights growing out of the bill will depend upon the nature of their contract with respect to

it; as, for example, if the acceptor is an accommodation acceptor, upon the payment of the bill he will have a cause of action against the drawer for money had and received. On the other hand, if the acceptor has funds in his hands against which the drawer has a right to draw the bill, its acceptance and payment would amount simply to a discharge of the acceptor's original obligation to the extent of the amount of the bill. But if the bill was drawn for the benefit and accommodation of the acceptor, and he received the proceeds and benefit thereof, then the drawer is the accommodation party, and the obligation, as between the drawer and acceptor, is that of the acceptor. Edelen v. White, 6 Bush, 408. Applying this doctrine to the case at bar, we find that, as between these parties litigant, their agreement was that the warehousemen, the acceptors of the bill, were to furnish money by way of loan or advancement to the drawer of the bill with which to buy tobacco to be shipped to the acceptors, and by them sold on account of the drawer, and the proceeds applied to the discharge of the acceptor's debt thus created. Therefore, upon the making of the first draft, that is, the original sight draft, which was paid by appellees upon presentation, the relation of debtor and creditor was created, the acceptor's claim against the drawer being for money had and received. The making of a new bill at four months by the original drawer upon the warehousemen as acceptors and in favor of the warehousemen's bank, the First National Bank of Clarksville, was a new arrangement by which the drawer of the bill drew it as an accommodation to the acceptors' and the bill was used by the acceptors with which to raise money for their own account. Therefore, not only as between the bank and the acceptors, but as between the drawer and acceptors, the acceptors were the principals in this last ob-

ligation. All the interest that they paid to the bank, whether usury or not, was their own liability. From this it follows that it was error to charge any part of this interest to appellant, and that, in so far as the note sued on embraced such items, it is without consideration. But appellant is liable to appellees to the extent of the money furnished to him upon the original sight drafts, with 6 per cent. per annum interest thereon from the date it was so furnished until paid.

3. To entitle one to the benefits and privileges accorded by the statutes of Tennessee to tobacco warehouses, he is compelled to make showing that he is equipped with a suitable warehouse, appliances, etc., and to enter into bond of $5,000 to the State that he will keep his warehouse in proper condition, etc., and to take an oath prescribed by the statute. The sections of the Tennessee Code covering these matters, including privileges and penalties, are as follows:

"3379 (1877a) 2594. Warehouses. Any citizen may open a warehouse for the inspection and sale of tobacco under the rules, regulations and restrictions of this article."

"3380 (1879a) 2596. Proof of Sufficiency of Warehouse Required. Every person so doing shall prove to the clerk, by the testimony of two impartial witnesses known to him to be well qualified, from knowledge and experience, as judges in the matter, that he is proprietor of a good and sufficient warehouse, so situated as to be exposed to no extraordinary risk from fire or flood, and furnished besides, with all the implements necessary to the accurate weighing and inspection of tobacco.

"3381 (1880a) 2597. Bond of Tobacco Warehouseman. He shall also enter into bond, with good and sufficient security to be approved by the judge or chairman of the county court,

and payable to the State, in the sum of five thousand dollars, conditioned to keep his warehouse in good condition and repair, so as to effectually protect the tobacco stored therein; that he will not sell any tobacco that has been bought by him, or on his account, or purchased on his account any tobacco stored in his warehouse, either directly or indirectly, and that he will perform faithfully all the duties of warehouse keeper as prescribed by law.

"3382 (1881a) 2598. Failing to Give Bond, not to Collect Fees; Penalty. Should said proprietor fail to execute said bond for five thousand dollars, then he shall not be entitled to collect any fees on tobacco stored in his warehouse, under a penalty of one hundred dollars for each offense, to be recovered in the name of the State, one half to go to the informer.

"3383 (1882a) 2599. Who may Sue, Bond. Any planter or person aggrieved may sue on this bond for a breach thereof in the name of the State, until the penalty is exhausted."

Sections 3388, 3389, then provide the duties of inspectors and their deputies:

"3399 (1898a) 2615. Feees, Commissions, etc. The compensation of warehouse keepers for receiving, storing, inspecting, coopering and selling tobacco shall be as follows: to-wit: To be paid by the seller, $2.50 and one per cent. commission on proceeds of sale; to be paid by buyer, $1.50, and for storage after sale, after the first thirty days, for each month or part thereof, twenty-five cents.

"3400 (1899a) 2616. Penalty for Extortion. Any warehouse keeper who shall charge more than is allowed in the preceding section, is guilty of a misdemeanor, and is also liable to a penalty of $10 to the planter or person over charged, recoverable before any justice of the peace.

"3401 (1900a) 2617.   Refusing Bid.   Any planter or other owner of tobacco sold at auction, may, by paying the fees, refuse at the time to take the price at which it was cried off."

It is claimed that appellees failed to comply with these sections in any particulars, and especially in these:   They originally opened a warehouse in a certain part of the town, calling their house the "Grange."   Later they removed to another warehouse, calling it the "Gracy."   They did not execute a new bond, or take the oath anew, when they made this removal (although they seem to have complied originally).   Appellant insists that the purpose of the bond, etc., is directed to the "house," while appellee's version is that it is to the business only.   We are of the latter view. It is also provided that warehousemen, by taking the oath and executing the bond referred to, became thereby inspectors of tobacco, and are charged with certain duties as such.   No provision is made for any other inspector than one who is a warehouseman, except that warehousemen who are inspectors may appoint deputies.   There appears nothing in the chapter, as quoted to us, requiring such deputies to be warehousemen.   The warehousemen of Clarksville, and the wholesale buyers patronizing that market, organized a corporation under the laws of Tennessee as early as 1878, known as the "Clarksville Tobacco Board of Trade."   Only buyers and sellers of tobacco in that market are eligible as members.   One of the rules or by-laws adopted by the board is:   "That this board decides that an independent board of inspectors shall be elected, who shall be deputized by the board of warehousemen as inspectors, to act in their place."   Then follows a formula by which such inspectors are to be chosen, and regulating their compensation.   We are of opinion that each of the warehouse-

Bailey and Others v. Wood and Others.

men had the right to designate as their deputies the same persons. Nor is there any impropriety shown, and at least no illegality, in their allowing such deputies to be nominated or agreed upon by the method of submitting the matter to a committee of warehousemen and buyers. We are clearly of opinion that appellees were entitled to receive and collect the statutory fees for receiving, storing and selling appellant's tobacco.

Appellant claims that under section 3399 the fee therein provided to the warehousemen is in full of all the services that he may render to the shipper; that the charge of $2 for reselling, called "resampling," is an extortion, under section 3400. In the absence of a construction by the courts of Tennessee of this section, this court is inclined to hold, and in this case does hold, that the fee of $2.50 and 1 per cent. commission allowed the warehousemen against the shipper is meant to cover only those items specifically referred to in that section. It was shown in this case that the shipper, within a given number of days after an auction sale of his tobacco, has the right to reject a bid, under section 3401; that appellant did reject bids to the extent of about 160 in number, thus necessitating a resale of that tobacco. It was shown that the actual expense to the warehousemen was about $2 in each case of resale. It has been the custom in that market for about 20 years to charge this fee for resampling or reselling. It does not appear that any prosecutions or suits for extortion have been brought by the parties to these innumerable transactions in the courts of Tennessee, all parties apparently acquiescing in this rule of the board of trade. Such a contemporaneous construction by the parties directly affected by the act for such a great length of time is strongly

persuasive that the charge under question is not prohibited by the statutes, and therefore not an extortion.

The judgment is reversed, and cause remanded, with directions to ascertain the amount of interest included in the note sued on, growing out of the discounting by appellees with the First National Bank of Clarksville of appellant's time bills of exchange, and to deduct the same from appellant's debt, but to charge appellant in lieu thereof the 6 per cent. per annum interest upon the moneys furnished him by appellees on the sight drafts as of the date of their payment by appellees, and for other necessary proceedings not inconsistent herewith.